[S. F. No. 2700.   Department One.—August 4, 1903.]

JOHN C. HAMPTON et al., Respondents, v. OCCIDENTAL AND ORIENTAL STEAMSHIP COMPANY et al., Appellants.

ACTION FOR DEATH—COLLISION—NEGLIGENCE—PROVINCE OF JURY—IN-STRUCTION AS TO MATTERS OF FACT—ORDER GRANTING NEW TRIAL.—In an action for death occasioned by the collision of steamers, owing to the negligence of the defendants, the negligence is an ultimate fact to be determined by the jury; and where it appears that the jury, notwithstanding they may have believed certain probative facts stated in an instruction, might have found from the evidence that the collision might have been avoided by proper precautions on the part of the defendant company when the dangerous position of the other steamer was perceived, an instruction reciting that if the jury believed such probative facts, then the defendant's steamer "was fully complying with the rules and regulations governing her proper action in entering the harbor," erroneously charged the jury upon matters of fact, and an order was properly made granting a new trial for such error.

APPEAL from an order of the Superior Court of the City and County of San Francisco granting a new trial. John Hunt, Judge.

The facts are stated in the opinion of the court.

W. H. L. Barnes, and P. F. Dunne, for Appellants.

T. M. Osmont, for Respondents.

VAN DYKE, J.—Appeal from the order granting plaintiffs' motion for a new trial.

The parents of the plaintiffs, John C. Hampton and Helen M. Hampton, his wife, were passengers on the steamer City of Chester, August 22, 1888, bound from San Francisco to Eureka, Humboldt Bay, and were drowned by the sinking of said vessel, in consequence of a collision with the steamer Oceanic, operated and controlled by the defendants, in the entrance to the bay of San Francisco, between Fort Point and Lime Point, and near the latter. The action is for damages for the death of the plaintiffs' parents, upon the ground

that the collision occurred through the negligence of the said defendants.

It is recited in the order granting the new trial that it is based upon the sole ground that the court erred in giving defendants' instructions Nos. 3 and 14. Instruction No. 3 is as follows: "If you believe from the evidence that the Oceanic arrived off the port of San Francisco on a voyage from Japan and China on the morning of August 22, 1888, and that the weather was foggy, and that, as the Oceanic entered the harbor, the officers of the ship were at their proper station and an efficient lookout was kept and proper discipline maintained; that the steam-whistle was kept going at intervals of less than a minute, and that for a reasonable time prior to the accident the steamship was proceeding dead slow; that somewhere between Point Bonita and Point Diablo the master and pilot of the Oceanic heard the fog-whistle of an outgoing steamship, and if you believe from the evidence that after passing Point Diablo she was still going slow, and that the master and pilot of the Oceanic were looking carefully on the starboard bow, from which direction the fog-signal was coming, and saw the hull of a vessel coming through the fog, which proved to be that of the Chester, and that she was from two to three points on the starboard bow of the Oceanic and about half a mile distant; and that two blasts were then blown on the whistle of the Oceanic, and that the helm of the Oceanic was at the same time put hard astarboard; that the signal meant 'We are going to port,' and that it was understood by and answered by two similar signals from the Chester, signifying that she also would go to port; that had the City of Chester acted on her starboard helm, as thus signaled, the two ships would have passed in safety; and that after the second signal to go to port was given by the Oceanic and answered and accepted by the Chester, if the City of Chester had answered her helm, there would have been no collision between the two steamships; and that as soon as the failure of the Chester to answer her helm or to do what she had agreed to do in steering, if she did thus fail, was noticed, the captain of the Oceanic rang the telegraph 'Full speed astern,' and that his order was promptly obeyed, and that at the time of the collision of the steamers

the backwash of the Oceanic's propeller was coming up between the funnel and the bridge of that steamer; and the Oceanic was backing at full speed astern; then I charge you that the Oceanic was fully complying with the rules and regulations governing her proper action in entering the harbor." We think the learned judge of the court below was correct in holding this instruction to be erroneous. After an enumeration of certain facts, it concludes: "Then I charge you that the Oceanic was fully complying with the rules and regulations governing her proper action in entering the harbor." This was instructing the jury as to the ultimate fact in the case. The action is founded upon the alleged negligence of the defendant, and negligence is the ultimate fact to be inferred from the many probative facts. It is for the jury to find the ultimate fact, even if these probative facts were undisputed. When different conclusions as to negligence can reasonably be drawn from the admitted facts, it is not for the court to instruct the jury as to which is to be adopted by them. (*Hennessy* v. *Bingham*, 125 Cal. 627.) Even if the probative facts had been as recited by the court, under the evidence and circumstances of the case, the jury might have been justified, for other reasons, in finding the ultimate fact that the defendants were negligent.

The case of Smith against the same company defendant, for damages growing out of the same collision here, was tried on the admiralty side of the United States district court in San Francisco, and from a decree therein rendered was taken to the circuit court of appeals. (*Occidental etc. S. S. Co.* v. *Smith*, 74 Fed. 261.) In the opinion affirming the decree of the United States district court, the circuit court of appeals recites the circumstances of the collision, the same as shown in the record herein, and a diagram showing the course of the vessels in the straits at the time of the collision appears on page 266 of said report, and the same diagram is found in the transcript herein, on pages 216 and 217, and it is said there: "If the court should find as a fact that the course of the Oceanic in entering the port, and her position at the time of coming in sight of the City of Chester, was as claimed by the appellant, such finding would not exculpate the Oceanic, unless the position of the Chester was south of mid-channel;

for if, at the time of giving passing signals, both vessels were near mid-channel, or if the positions and courses of the two vessels made it necessary for them to pass each other in the narrows, and on the same side of mid-channel, the law of the road required each to turn to the right, so as to pass each other port to port, and the Oceanic, in taking the initiative of signaling to pass on the starboard hand, assumed the risk of all consequences.  If both vessels were north of mid-channel, in that comparatively narrow passageway, they must have appeared to each other, at a distance of half a mile, to have been approaching each other end on, or nearly so.  Each vessel was therefore required by article 15 of the revised international rules and regulations for preventing collisions at sea, adopted by act of Congress, March 3, 1885, (23 Stats. 438, 441,) to alter her course to starboard so as to pass on the port side of the other.  If, however, they were not meeting end on, or nearly so, then necessarily the two vessels were on crossing courses, and the Oceanic had the Chester on her starboard side, and it was made her duty, by article 16, to keep out of the way of the other vessel, and failure to do so, in view of the claim made on her behalf that she was officered, manned, and equipped in the most perfect and complete manner, and under perfect command, was inexcusable.  The position in which the witnesses for the appellant placed the Oceanic—hugging the north shore—proves too much, for the collision could not have occurred without fault on the part of her officers.''  The testimony in the transcript here shows the collision to have occurred as stated in the opinion in the United States circuit court of appeals.  The master of the Oceanic testified that she was entirely manageable and rode on the flood-tide; that he was well acquainted with the currents and tides there, and at the flood-tide a current set across from Fort Point northeasterly; that the City of Chester was not answering her helm, and appeared to be heading towards the Oceanic.  In *The Johnson,* 9 Wall. 146, it is said, ''Rules of navigation are obligatory upon vessels approaching each other from the time the necessity for precaution begins, and they continue to be obligatory as the vessels advance, so long as the means and opportunity to avoid the danger remain.  They are not strictly applied to a vessel which is so

close that the collision is inevitable, and they are wholly inapplicable when the vessels are so distant from each other that measures of precaution have not become necessary to prevent a collision. But precautions, in order to be effectual, must be reasonable; and if they are not so, and the collision ensues because they were not adopted earlier, it is no defense to show that they were adopted as soon as the necessity for the precaution was perceived, nor to prove that at the moment of the collision it was too late to render such a precaution of any service." So here, even if the facts had been as stated by the court, still the jury might have found from all the circumstances of the case, as detailed in the evidence, that the collision might have been avoided by proper precautions having been taken on the part of the defendant company when the dangerous position of the Chester was perceived. In *The Sunnyside*, 91 U. S. 208, the court says: "Precautions not seasonable are of little or no value, nor do such efforts constitute a compliance with the usages of the sea or the statutory rules of navigation. Such precautions must be seasonable in order to be effectual; and if they are not so, and a collision ensues in consequence of the delay, it is no defense to say that nothing more could be done to avoid the collision, nor that the necessity for precautionary measures was not perceived until too late to render them availing." Therefore, if all that is said in the instruction in favor of the Oceanic were true, still the jury might have found the facts that when it was discovered that the Chester was out of her course, or for some reason unable to mind her helm, that the Oceanic might have shifted her course so as to have avoided the collision, and if she could have avoided the collision and failed to do so, under the rules stated it constituted negligence.

Instruction 14, given on behalf of the plaintiff, is as follows: "If you believe from the evidence that the officers of the City of Chester knew where she was with reference to the set-off to the tide from Fort Point; and that the Oceanic, from the signals given and exchanged, supposed that the City of Chester would pass to the left going out, the signal of the Chester that it would adopt this rule of navigation must be held to have been presumably given in view of all the con-

tingencies which affected the City of Chester, including its steam-power and its 'ability to mind its helm, the condition of its propeller, and the knowledge of its officers of the conditions of the tide. Such matters were properly within the knowledge of the officers of the City of Chester, and were not matters which the officers of the Oceanic are presumed to know."

That instruction, it will be seen, closes with the statement that the officers of the Oceanic were not presumed to know the matters therein enumerated. On the contrary, it appears from the evidence that both the captain and pilot were well acquainted with.the tides and currents and set of the tide, and all the matters referred to in the instruction, as well as the City of Chester. The captain testified: "I know how the tides run in the Golden Gate at the place where the collision occurred. . . . I am perfectly well acquainted with the tides and the currents of the bay; and know how the tide sets in at Baker's Beach." He was asked: "If a vessel is approaching Fort Point, or a little to the north of Fort Point, inside of the fort, and gets its prow into that tide that sets across mid-channel, what is the effect of the tide upon such vessel?—A. Going outward it turns the ship to the north.

"Q. Is there any danger of the vessel being driven to the north by that tide?—A. There is no danger, because men able to navigate are prepared for it, and alter their helm accordingly before they strike it.

"Q. But the tendency is to drive the vessel over to the north, towards Lime Point?—A. If she has got out here [pointing to the channel south of mid-channel]. On the regular course out it would not hurt her a bit. It might alter the course a little, and you would put your helm to meet it. . . . I could not tell what part of the tide the Chester was in. I knew that when she reached the proper position she would have to cross that tide.

"Q. Would she reach that position before the vessels passed each other?—A. I cannot say.

"Q. You knew where you were?—A. Approximately I did, but not within two hundred yards.

"Q. You knew approximately where she was?—A. Approximately, yes, sir.

"Q. You knew that she had to cross that tide?—A. Yes, sir, I did.

"Q. You knew the effect of that tide was to swing her around to the north?—A. Yes, sir."

He testified further: "I watched the ship carefully for a second or two, and I saw she was not answering her helm rightly; that her helm was apparently hard aport; and I put our engines full speed astern. In a second or two after I gave the second signal I ordered full speed astern." He also admitted that he had given testimony on this subject in the suit of *Smith* v. *Occidental and Oriental Steamship Co.*, 61 Fed. 338, in the United States district court.

The instruction, therefore, is not only against the facts in the case as established by the testimony, but, like the other instruction, took from the jury the right to find upon those facts whether the Oceanic knew as well as the Chester the matters stated.

The constitution is imperative,—"Judges shall not charge juries with respect to matters of fact,"—and its mandate must be obeyed. In the foregoing instructions the trial judge did instruct the jury with respect to matters of fact, and that, too, in a material matter, and it is fair to presume that but for such erroneous instructions the result of the trial would have been different. In granting the new trial the learned judge of the court below must have been satisfied also that a different result would have followed, otherwise the error in giving the instructions complained of would have been harmless.

The trial in this case was in January and February, 1896, and the new trial was granted in December, 1900, nearly five years thereafter. In the mean time this court had in several cases disapproved of this style of instruction. In *Hennessy* v. *Bingham*, 125 Cal. 627, it is said: "These hypothetical instructions are always dangerous, and especially so in a case of alleged negligence." The fault, however, is not so much that of the judge who tries the cause as it is that of the lawyer who prepares them. Being overzealous perhaps in the interest of his client, the attorney formulates a string of such "dangerous" instructions, taking the chances of having them given; whereas, the judge being engrossed perhaps in a long

and complicated trial, is not afforded the time or opportunity frequently to properly weigh their import before they are given.

The order granting a new trial is affirmed.

SHAW, J., concurring.—I concur upon the ground that the instruction No. 3 is erroneous. In my opinion, instruction No. 14 is not objectionable. It does not say that the officers of the Oceanic are not presumed to know "the conditions of the tide." It says they are not presumed to know "the *knowledge* of *its* [the City of Chester's] officers" of the conditions of the tide. This they could not know.

ANGELLOTTI, J., concurring.—I concur upon the ground that the instruction No. 3 discussed in the opinion was erroneous.