[Sac. Nos. 1198 and 1257. In Bank.—March 27, 1906.]

## DANIEL MANNING, Respondent, v. APP CONSOLIDATED GOLD MINING COMPANY, Appellant.

NEGLIGENCE — MASTER AND SERVANT — LOWERING UNLASHED POLES IN MINE—SUFFICIENCY OF COMPLAINT—GENERAL DEMURRER.—In determining whether the complaint of a servant for alleged negligence of his employer, in failing to provide ropes with which to lash mining-poles longer than the skip, which were lowered in a mining shaft in which plaintiff was working, and that a pole longer than the skip fell down the shaft to his injury, states a cause of action as against a general demurrer, the complaint is to be liberally construed with a view to substantial justice, and any mere ground of special demurrer for uncertainty of the pleading, in failing dis-

tinctly to allege that the pole by which he was injured was being lowered down the shaft unlashed, must be resolved in support of the complaint.

ID.—QUESTION OF FACT FOR JURY—CONFLICTING EVIDENCE OF NEGLIGENCE—ERRONEOUS INSTRUCTION.—Where the evidence was conflicting as to whether the defendant had furnished lash-ropes for use by the skip-tender in lashing the poles, the question of negligence was one of fact for the jury; and it was an erroneous instruction as to a matter of fact to tell the jury that poles sent down unlashed constituted negligence *per se* on the part of the defendant, and assumed a determination of the very question at issue.

ID.—FURNISHING OF APPLIANCES BY MASTER—ADJUSTMENT BY SERVANT.—If the master furnished to the skip-tender the necessary appliances of sufficient lash-ropes with which to fasten the mining poles before they were sent down into the mine, the matter of adjustment pertaining to the duties of the skip-tender was a mere detail in the discharge of his work, and the master is not responsible for the negligence of the skip-tender in failing to properly adjust the appliances and materials after they had been furnished to him.

ID.—CONSTRUCTION OF STATUTE.—Section 4 of the act of 1893, for the protection of miners, requiring that ''All timbers, tools, etc., 'longer than the depth of the bucket,' to be hoisted or lowered, must be securely lashed at the upper end of the cable,'' cannot be reasonably construed as imposing a personal liability upon an employer to do the lashing, if he furnishes the necessary lashing material to servants whose duty it is to adjust the material furnished.

APPEAL from a judgment of the Superior Court of Tuolumne County, and from an order denying a new trial. G. W. Nicol, Judge.

The facts are stated in the opinion of the court.

A. H. Ricketts, and Carter, Ricketts & Dolph, for Appellant.

J. P. O'Brien, for Respondent.

LORIGAN, J.—In this action two separate appeals are taken by defendant, one from the judgment in favor of plaintiff for the sum of five thousand dollars, which is taken on the judgment-roll, the other an appeal from the order denying the motion of defendant for a new trial, which is presented upon a statement of the case.

Upon the appeal from the judgment the only point made is that the complaint fails to show by proper averment that

the injury complained of by plaintiff was caused by the negligent act of the defendant. The complaint alleges that the defendant is a corporation, and at the time plaintiff was injured was the owner and engaged in working the App Mine in Tuolumne County; that said mine was operated by and through an inclined shaft sunk to a depth of about 1,140 feet from the surface; that levels and drifts were run at various points between the surface and the bottom of the shaft; that tracks were laid in and along said shaft over and upon which a skip was run; that said skip was attached to a cable and was lowered and hoisted by means of it, and that the skip was used for the purpose, among others, of lowering into the mine through said shaft timbers, mining poles, and other things that were used in the mine; that on the 16th day of February, 1902, the plaintiff was in the employ of the defendant as a miner and was working in said mine at the bottom of the shaft in sinking the shaft; that on said day the defendant negligently lowered in the skip and down the shaft into said mine mining poles that were longer than the depth of the skip without lashing them at the upper end of the cable, and without lashing them at all. Also that the defendant on said day negligently failed to provide ropes with which to lash to the cable mining poles that were longer than the depth of the skip; that defendant also negligently failed to provide a safe and secure place for the plaintiff to work in said mine; that on the sixteenth day of February, 1902, while plaintiff was working as a miner in the bottom of said shaft, and while the defendant was carelessly and negligently lowering down the shaft in the skip mining poles that were longer than the depth of the skip without being lashed, and while the defendant was working and operating said App Mine without providing ropes with which to lash the mining poles, and while the defendant was operating said mine without providing a safe and secure place for the plaintiff to work in the bottom of the said shaft, a mining pole that was longer than the depth of the skip—to wit, a mining pole about eighteen feet long— fell down the shaft to the place where plaintiff was working and struck him, causing very serious injuries; that the falling of said mining pole down said shaft was caused by and through the carelessness and negligence of the defendant in lowering

down the said shaft in said skip mining poles that were longer than the depth of said skip without lashing them, and also in not providing safe and suitable appliances with which to lower down the shaft in the skip mining poles that were longer than the depth of said skip, and also in not providing a safe and secure place for the plaintiff to work in said mine.

Defendant interposed a general demurrer to the complaint which was overruled. The particular point urged against the legal sufficiency of the complaint on this appeal is that, while it alleges that the defendant at the time mentioned negligently conducted itself in lowering down the shaft mining poles that were longer than the depth of the skip, without lashing them to the skip cable, or lashing them at all, it is not alleged that the fall of the mining pole which caused the injury to plaintiff was the result of that negligence; that there is an absence of any allegation that the act of negligently lowering said poles was the direct or proximate cause of such injury. In this view it is contended that, as far as appears from any allegation in the complaint, the pole by which plaintiff was injured may have fallen from the surface while being placed in the skip and before it was in a position to be lashed, or have fallen from some point within the shaft after being safely landed at some station in the shaft below the surface, or escaped down the shaft while being handled at some station above the point where plaintiff was at work, after it had been unloaded from the skip and when danger from failure to lash had passed.

It must be conceded that the complaint is open to criticism in not directly and distinctly alleging that the pole which fell and injured plaintiff was one of those which was being lowered unlashed down the shaft in the skip. The most, however, that can be urged against the complaint in this respect is that the causal relation between the alleged negligent lowering of unlashed poles in the skip and the injury to plaintiff is not alleged with sufficient certainty; that the allegation is too general. Conceding this to be true, there was no entire absence of averment upon this subject, but simply a defective averment which should have been reached by special demurrer. (*Silveira* v. *Iversen*, 128 Cal. 187, [60 Pac. 687]; *Eachus* v. *Los Angeles*, 130 Cal. 496 [62 Pac. 829, 80 Am. St. Rep. 147]; *Hunt* v. *Davis*, 135 Cal. 35, [66 Pac.

957].)   Besides, in construing a pleading for the purpose
of determining its effect the rule is that its allegations must
be liberally construed with a view to substantial justice
between the parties.   (Code Civ. Proc. sec. 452.)   All the
allegations in the complaint previous to the one which deals
with the falling pole are addressed to alleged negligence of
the defendant in the method of lowering and the act of
lowering poles in the skip which were longer than the skip
itself.   The gist of the negligence is alleged to consist in
lowering them in the skip unlashed.

As to the fall of the pole, it is then alleged that while
such lashing of poles was going on, a pole longer than the
depth of the skip fell down the shaft and injured plaintiff.
It is true that it is not directly alleged that the pole which
fell was one of the unlashed poles which were then being
lowered, but, taking the allegation as to the falling of a pole
in connection with the allegation immediately preceding, that
it occurred while unlashed poles were being lowered, we
think the complaint must be fairly construed as substantially
charging that the pole which fell was one of those which
were being lowered unlashed in the skip down the shaft.   It
would hardly be a fair construction to hold, in view of the
reiterations in the complaint of negligence on the part of
defendant in lowering unlashed poles, with the further and
accompanying allegation that plaintiff was injured by a pole
falling while such lowering was going on, that all this might
have reference to some other pole than one of those which
were being lowered in the skip at the time.   Evidently the
only poles which were referred to in the complaint were those
which were being actually lowered unlashed at the time of
the accident, and, fairly construed, the allegation that a pole
fell while this was being done had reference to the falling
from the skip of one of the poles which were being lowered
therein.   So construed, the complaint stated a cause of action
and is sufficient to sustain the judgment.

As to the second appeal which is taken by the defendant
from the order denying its motion for a new trial.   We have
already referred to the allegations in the complaint.   In its
answer defendant denied any negligence on its part in lower-
ing said poles in the manner stated in the complaint; denied
that it had failed to and did not furnish rope with which

to lash all mining poles sent down into the mine, and affirm-atively averred, among other things, that at the time the accident occurred, the most approved method and manner of lowering them down the shaft had been adopted and was then in use, and that it had supplied suitable appliances and safe materials for that purpose. To these issues the evidence in the case was addressed. It appears from the evidence that the plaintiff was injured by the fall of a pole, one of four which were being sent down in the skip to the nine-hundred-foot level of the mine; that these poles were longer than the depth of the skip, which measured about eleven feet, and were sent down by the skip-tender of defendant, whose duty it was to lower timbers and mining poles down the shaft; that these mining poles were sent down unlashed, save that chains attached to the middle of the skip on each side of it were brought around them, but evidently were not sufficiently tightened to hold them securely in place; that in the descent of the skip one of these poles—eighteen feet long—fell out of it and lodged in the shaft; that immediately thereafter this pole became dislodged, fell to the bottom of the shaft and injured plaintiff, who was working there. There was evidence on the part of defendant that the chains on the skip could have been adjusted, by the skip-tender, about the skip and poles so as to securely hold in the skip the poles sent down, and that the chains were sufficient for that purpose, though there was also evidence on the part of plaintiff that these chains, from their position in the skip, could not be tightly fastened about such a small load and that these poles could not be secured in the skip without being lashed with rope. Upon the issue as to whether the defendant had fur-nished lash-ropes for use by the skip-tender in lashing the poles, the evidence in the case was conflicting; that introduced on the part of the plaintiff tending to show that it had not, while that upon the part of the defendant tending to show that it had furnished ample rope to the skip-tender for that purpose, with instructions to use it in lashing the poles. It is unnecessary to further detail the evidence, as enough of it is shown under which to consider the grounds urged by appellant for a reversal of the order.

The principal point made by appellant is that the court erred in its instructions to the jury. The instruction particu-

larly complained of was one given at the request of the plaintiff, and reads: "(3) If you believe from the evidence that the defendant, the App Consolidated Gold Mining Company, on the 16th day of February, 1902, lowered in the skip and down the shaft in the App Mine any mining pole that was longer than the depth of said skip, without being securely lashed at the upper end of the cable by means of which cable said skip was hoisted and lowered in said mine, and if you also believe from the evidence that the failure of the defendant to securely lash at the upper end of the cable any mining pole longer than the depth of said skip, that was being lowered down the shaft in said mine, contributed directly to the injury of the plaintiff, provided, however, that you also believe from the evidence that the plaintiff sustained any injuries, then I charge you that such omission on the part of the defendant is evidence of negligence, and your verdict should therefore be for plaintiff." This instruction, under the issues and the evidence in the case, was clearly in violation of section 19 of article VI of the constitution prohibiting the court from charging the jury as to matters of fact, unless the giving of it can be sustained for the reasons presently to be considered. It was a question exclusively for the jury to determine whether, under all the evidence presented to it, the defendant was guilty of negligence in the respect charged. By its instruction the court told them that the fact itself that poles were sent down unlashed constituted negligence on the part of defendant; that this fact constituted negligence *per se.* In so doing it determined the sufficiency of the evidence as to the very matter in the case which was within the exclusive province of the jury from all the evidence to determine. While it was proper for the court to instruct the jury as to the degree of care to be exercised by an employer in the prosecution of his business, towards insuring the safety of his employees, still, whether, under the evidence in a case, he did exercise due care and vigilance in that respect, or was guilty of carelessness and negligence by failing to do so, is a question of fact upon which the defendant has the right to the judgment of the jury. (*Weiderkind* v. *Tuolumne Water Co.,* 65 Cal. 431, [4 Pac. 415]; *Kerrigan* v. *Market-Street Ry. Co.,* 138 Cal. 506, [71 Pac. 621]; *Hampton* v. *Occidental etc. S. S. Co.,* 139 Cal. 706, [73 Pac. 579].)

When the court instructed the jury that if mining poles longer than the depth of the skip were sent down the shaft unlashed to the cable it constituted negligence on the part of defendant, it assumed a determination of the very question at issue. In effect, by this instruction, the court told the jury to return a verdict for the plaintiff. This was necessarily that effect, because there was no dispute in the case but that poles longer than the depth of the skip were sent down by the skip-tender unlashed to the cable, nor was there any reasonable question under the evidence but that this fact contributed directly to the injury of plaintiff. The question, however, was whether, under all the evidence in the case, the defendant was shown to have been negligent in the discharge of any duty it owed plaintiff. In determining that question there was more to be taken into consideration by the jury than the mere fact that the skip-tender sent down mining poles unlashed. It was an issue in the case whether the defendant had furnished reasonable and adequate appliances with which its skip-tender could have carefully and safely secured these poles in the skip, and there was evidence tending to show that it had. There was no personal duty devolving on the defendant to lash the poles, unless it was cast on it under the terms of a statute shortly to be referred to. While the law required defendant to furnish suitable and proper appliances with which the work to be performed by its employees might be safely done, when these had been furnished the duty of defendant in that particular had been discharged. If in the case at bar the defendant had furnished to its skip-tender sufficient lash-rope with which he could have fastened the mining poles before they were sent down into the mine, then its duty to furnish proper appliances was fulfilled because it is not claimed by the plaintiff that it was derelict in any other particular as regards such appliances. It was not responsible for the negligence of the skip-tender in failing to properly adjust the appliances and materials after they had been furnished to him. Having furnished the necessary appliances, the matter of adjustment pertained to the duties of the skip-keeper and was a mere detail in the discharge of his work. (*Burns* v. *Sennett*, 99 Cal. 368, [33 Pac. 916]; *Callan* v. *Bull*, 113 Cal. 593, [45 Pac. 1017]; *Kerrigan* v. *Market-Street Ry. Co.*, 138 Cal. 510, [71 Pac. 621]; *Leishman*

v. *Union Iron Works,* 148 Cal. 274, [83 Pac. 30].)  In fact, the court so instructed the jury to this effect at the request of defendant in the case at bar, but it will be perceived that such an instruction was radically at variance with the instruction now in question.

If, as contended for by defendant, it furnished sufficient appliances to the skip-tender for use in securing and lashing the poles during their descent into the mine, and the latter failed to use them for the designed purpose, the defendant could not be made responsible for that failure.  Any injury sustained by plaintiff through such failure would be the result of negligence on the part of a fellow-employee with plaintiff in the same general employment for which, under a familiar principle of law, defendant would not be responsible.  The defendant was entitled under proper instructions from the court to have these matters considered by the jury upon the question of its alleged negligence.  This right, under the instruction complained of, was denied, and the jury erroneously instructed that the act of the skip-tender in sending down the poles in the manner referred to therein was negligence *per se* and the defendant responsible for the resultant injury.  In supporting this instruction of the court we do not understand counsel for respondent to question but that, under the general rule of law, the duty of defendant to furnish suitable appliances to its employees for the purpose of safely performing their labor was discharged, when it furnished the necessary rope to the skip-tender with which to have lashed the mining poles in question when he sent them down in the skip.  On the contrary, the position of counsel for respondent is, conceding this to be the general rule, that it has no application to the case at bar because he claims that by a statute of this state it is made the positive personal duty of defendant to securely lash, in the manner as stated in the instructions, all mining poles of the length which were being sent down in the shaft when plaintiff was injured, and that irrespective of all other considerations, it was negligence *per se* on the part of defendant under the statute to send them down without being lashed to the cable, as the statute required.

The statute to which counsel for respondent refers as sustaining this claim is one passed by the legislature of this

state at its session of 1893 (Stats. 1893, p. 82, c. 74), and is entitled "An act to establish a uniform system of mine-bell signals, to be used in all the mines operated in the state of California and for the protection of miners." Referring to such portions of this act as are germane to the present inquiry, section 1 thereof declares: "Every person, company, corporation, or individual, operating any mine within the state of California—gold, silver, copper, lead, coal, or any other metal or substance, where it is necessary to use signals by means of bell or otherwise, for shafts, inclines, drifts, crosscuts, tunnels, and underground workings—shall, after the passage of this bill, adopt, use, and put in force the following system or code of mine-bell signals, as follows:" Here immediately follows, as part of this section, a system of mine-bell signals with a statement as to meaning and purpose of each, for example: "1 bell, to hoist. 1 bell, to stop if in motion. 2 bells, to lower," and a number of other bell signals and their meanings. Among these signals is found: "6 bells, send down timbers (see rule 4)." Section 2 provides: "For the purpose of enforcing and properly understanding the above code of signals, the following rules are hereby established." Immediately following are six rules. Rule 4 reads: "All timbers, tools, etc., 'longer than the depth of the bucket ' to be hoisted or lowered, must be securely lashed at the upper end of the cable. Miners must know they will ride up or down the shaft without catching on rocks or timbers and be thrown out." Rule 5 reads: "The foreman will see that one printed sheet of these rules and signals for each level and one for the engine-room are attached to a board not less than twelve inches wide by thirty-six inches long, and securely fasten the boards up where signals can be easily read at the places above stated." Rule 6 reads: "The above signals and rules must be obeyed. Any violation will be sufficient grounds for discharging the party or parties so doing. No person, company, corporation, or individuals operating any mine within the state of California, shall be responsible for accidents, that may happen to men disobeying the above rules and signals. Said notice and rules shall be signed by the person or superintendent having charge of the mine, who shall designate the name of the corporation or the owner of the mine." "Sec. 3. Any person or company failing to

carry out any of the provisions of this act shall be responsible for all damages arising to or incurred by any person working in said mine during the time of such failure.''

It is insisted by respondent that rule 4 of the statute, supplemented by the closing section of the act—section 3—imposed a personal duty upon the defendant as a mining corporation to securely lash all mining poles of a certain character in a designated manner when they were to be sent in a skip down the shaft, and made it responsible for any injury occasioned through a failure to comply with the statutory rule, and it is only fair to say that it was doubtless upon such a construction of the statute that the lower court based the instruction complained of. If the construction contended for by respondent were true, it would no doubt support the correctness of the instruction, because it is well settled as the law in this state that failure to perform a duty imposed upon one by statute or other legal authority, which omission has proximately contributed to an injury, is always to be considered as evidence of negligence. (*Siemers* v. *Eisen,* 54 Cal. 418; *Driscoll* v. *Market-Street Ry. Co.,* 97 Cal. 563, [32 Pac. 591, 33 Am. St. Rep. 203]; *McKune* v. *Santa Clara etc. Co.,* 110 Cal. 486, [42 Pac. 980].) But we do not think the statute can be reasonably construed as counsel for respondent and the lower court undoubtedly construed it. The statute certainly in no direct or positive terms imposes any such personal duty or fixes any such responsibility, and without some indication in the statute that it was intended to impose a greater liability upon persons operating mines than is generally imposed upon other corporations and individuals, a court will not give it that effect by construction. Conceding the power of the legislature to impose a personal liability upon those operating mines, such as respondent contends is imposed here, there is no reason why courts, unless the legislature has clearly evidenced that intention in the statute, should industriously construe indefinite and uncertain language as imposing the liability when the effect of the construction is to deprive such person of defenses similar to those interposed in the case at bar, and which are available to all other employers who are conducting a business in which injuries to their employees may occur.

We do not think, however, that under any reasonable con-

struction of the statute it could be held that such personal liability is imposed. The statute is not a model of perspicuity. It is lacking in that clear expression of intention and coherence of provision which generally characterizes legislative enactments. When, however, it is carefully examined it is apparent that the enactment was intended to serve a twofold purpose. It was intended, first, to establish a uniform system of signals and accompanying rules to be put in operation and use in all mines of the state, so that no matter in what mine he worked, or how often he changed his employment from one mining locality to another within the state, a miner would find the same system of signals and rules in operation in every mine, and not be required to learn a new system of signals and rules accompanying them each time he changed his employment from one mine to another. In the second place, the establishment of this system of signals and rules was intended to afford an additional protection to the miners in the operation of the mine upon their part. It is of course a matter of common experience in operating mines that, notwithstanding an employer has selected competent employees, furnished proper appliances for doing the work, and a safe place to do it, still accidental injuries happen through negligence of fellow employees after all these precautions are taken by the employer. The signals and rules were intended to afford an additional security to the men in their operation of the mine among themselves, after the employer has discharged the duties cast upon him of furnishing for their protection, among other things, the proper appliances for doing so. When the act is examined it will be seen that all the signals prescribed are signals which are to be given by the employees in the mine, either from the levels or shaft, to their co-employees in the engine-room or at the mouth of the shaft, as to their wants below, mainly as to hoisting or sending down tools or materials into the mine. As to the rules themselves, they are not formulated as independent provisions, but, as the act distinctly says, are established ''for the purpose of enforcing and properly understanding the above code of signals.'' As the signals, from their character, are clearly devised for use among the employees of the mine, and the rules are established expressly for the purpose of enforcing and understanding these signals, it is quite evident

that the signals and the rules constitute one system, designed to be used among the employees with regard to their common employment, and as an additional protection against the carelessness or negligence of fellow employees, particularly in the use of or failure to use the proper appliances which the employer has furnished for the work.

When rule 4 is considered without relation to the general scope and purpose of the act, or its other provisions, it will be observed that there is an entire absence of any language in it which in any manner indicates upon whom is cast the duty of doing the lashing. As far as any intention is expressed, it amounts to no more than that the legislature deemed that mining timbers or poles of certain character should be lashed. Whether the legislature intended to fix a personal duty upon the employer to do this, or whether it considered that in the exercise of ordinary care the employer would furnish the necessary lashing material, and that the employee whose duty it was to respond to the signal to send down timbers should lash them before sending them down, is a matter upon which there is not the faintest indication in the rule. On this subject it is absolutely silent. In this indefinite condition of the rule itself as to what was intended in this respect, it is not to be assumed that the legislature intended, by a system of signals and rules designed for the benefit of the employees in the mine, to be used in relation with each other in prosecuting their common employment, to interfere with the general rule of law that the duty of the employer is discharged when he furnishes to his employees suitable and proper appliances to do their work, and that it is their negligence and not his should one of their fellow-employees neglect to use them. If the legislature designed to change the general rule, it required a clear expression of intention to that end; a clear indication that as to this particular matter and its application to mining operations the general rule should be changed and a different rule of liability on the part of the employer established. This statute rule 4 itself expresses no such intention, directly or inferentially. The general scope and purpose of the statute indicates that, aside from requiring the employer to adopt and enforce the system of signals, and to post them, and the rules established in connection with them, at certain points in the mine, and making the employer liable for damages incurred

during the time of his failure to do so, there is nothing to indicate any intention in any manner to change or interfere with the general rule of liability between employer and employee. That there was no intention to interfere with the general rule is. indicated by the terms of rule 4 itself. Its indefinite language, which simply directs that timbers must be securely lashed, without declaring who shall do it or who shall be responsible for the failure to do so, is significant to the effect that it did not intend to legislate on the matter of duty or responsibility at all, but to leave that to be determined under the general law. It contented itself with making a declaration of what in its judgment should be done, without prescribing upon whom the legal responsibility should be cast of doing it. And that the entire scheme, with reference to signals and rules, was intended to afford additional security to the employees, and to be used and adhered to by them in discharging the duties of their common employment for the protection of each other, is apparent from an inspection of rules 1, 2, and 3, which we have not quoted, but which have relation to matters pertaining to the conduct of the employees under the signals and rules as between themselves, with a view to their protection from accident.

It is also apparent from rule 6 that all the signals and rules are for the government of the employees. It provides for discharging parties disobeying them, and relieves the person operating the mine from responsibility for accidents to the men disobeying such rules and signals. These provisions of this particular rule clearly indicate that all the signals and rules are designed for the use and government of the employees, impose duties upon them, and that none of them impose any personal obligation upon the employer. Nor is the construction of rule 4 contended for by respondent at all strengthened by the language of section 3 of the act, making any person or company failing to carry out any of the provisions of the act, responsible for all damages arising to or incurred by any person working in the mine during the time of such failure. This provision could only have application in the event of a failure of defendant to discharge some duty it owed to plaintiff, imposed by the terms of rule 4. But, as under our construction, that rule imposes no such liability, the section can have no application as far as that

rule is concerned. This section has reference to the particular duties imposed on the defendant under the act; these duties are to adopt and put in force the system or code of mine-bell signals designated, and to see that a copy of these signals and the accompanying rules is posted at each level in the mine and in the engine-room. It is for a failure to discharge these imposed duties that the mine operator shall be held responsible under section 3 of the act. What the extent of that responsibility might be, in the event of a failure to comply with the statute in these particulars, is a matter of no present concern. It is not alleged in the complaint, nor is there any evidence, that defendant failed to do any of these things, and under the theory of counsel for respondent, whether the defendant did or did not was of no moment, because if rule 4 imposed a personal duty on defendant to lash the poles, it would be clearly liable, whether it put in force the signals and posted a copy of them and of the rules or not.

It is unnecessary to pursue this subject further. In the view we take of the statute, rule 4 imposed no personal duty on the defendant. It does not do so in terms or by reasonable or necessary implication. On the contrary, considering it with reference to the signals and the rules and the general scope and purpose of the act, it is apparent that it was not intended to do so. The conclusion we have reached upon the proper construction to be given to the provisions of the statute in question destroys the only support upon which the instruction given by the lower court can rest. As no personal liability was imposed on the defendant under the statute, the instruction complained of, given upon the theory that it did so, was erroneous. It was a question for the jury to determine whether, under all the evidence in the case, the defendant had been guilty of negligence as alleged, and that matter should have been submitted to them under instructions which would have left it exclusively to them to determine this controverted fact.

Another instruction given by the court, No. 4, is also complained of. This instruction need not be quoted at length. The court by it instructed the jury that if the defendant "failed to and did not provide ropes with which to lash at the upper end of the cable any mining poles longer than the depth of the skip that were being lowered down the shaft of

said mine in said skip . . . that the omission of the defendant in that behalf is evidence of negligence." Much that we have heretofore said applies to the giving of this instruction, and it should not have been given. As we have said, the court should not have assumed that this fact constituted negligence, but, under proper instructions as to the degree of care to be exercised by defendant in operating the mine, should have left it to the jury to determine under the evidence in the case whether or not that care had been exercised by defendant.

As we have heretofore stated, two appeals are taken in this case upon separate records,—an appeal from the judgment and an appeal from the order denying the motion for a new trial,—both prosecuted by defendant. We have considered and disposed of both in this opinion. In the appeal from the judgment the only point involved is as to the legal sufficiency of the complaint, and, as we have decided that it is sufficient, the judgment appealed from is affirmed. As to the appeal from the order denying the motion for a new trial, discussion of which we have just finished, for the reasons we have given with respect to the error committed by the court in giving the instructions complained of, that order must be and is reversed and the cause remanded for a new trial. As these appeals are taken and presented upon separate records, the plaintiff is entitled to his costs on the appeal from the judgment and the defendant to its costs on the appeal from the order denying the motion for a new trial.

Angellotti, J.; Shaw, J., Henshaw, J., and McFarland, J., concurred.